## FLAVELL vs. FLAVELL.

1. The deposition of a witness before a master must be signed by the witness; if not signed, it is imperfect, and cannot be read at the hearing.

2. The deposition of a witness, who, after his direct examination, secretes himself so that he cannot be cross-examined, will be suppressed.

3. The laws of this state, and the authorities upon the subject reviewed. The English rules stated.

4. The facts held sufficient to prove defendant guilty of adultery. Recriminating charge not sustained.

This was a suit by Abraham W. Flavell, for divorce from his wife, the defendant Charlotte A. Flavell, on the ground of adultery. The answer denied the adultery, and also charged the complainant with adultery by way of recrimination, and as a defence to the suit.

The case was argued upon the pleadings and proofs.

*Mr. J. W. Taylor*, for complainant.

*Mr. Cummings* for defendant.

THE CHANCELLOR.

The first question to be met in this cause, is upon admitting the testimony of George Moore. He was sworn on part of the complainant, and his cross-examination had been commenced by the defendant. The examination was adjourned at the close of the day, to be continued on the next day. The witness did not appear at the time to which the examination was adjourned, and has either absented or secreted himself; both parties have endeavored, without success, to find and produce him. He had not signed his direct examination, nor his cross-examination, so far as proceeded in.

The suppression of his testimony is asked for on both grounds, that he has not signed it, and that his cross-examination has not been completed. I am not aware that either of these questions has ever been considered or decided in this court; no decision upon either has been brought to my notice. In England, the signature of the witness to his ex-

amination is held necessary to entitle it to be read. In *Copeland* v. *Stratton*, 1 *P. W.* 414, decided by Lord Chancellor Parker, in 1718, this was settled to be the rule upon consultation with the master in attendance, and it has never been questioned or varied since. The practice there is to require the witness to sign each deposition when taken, before he leaves the master's office, and he signs each sheet with his name. 2 *Daniell's Ch. Pr.* 920, 921. And he signs the direct examination and cross-examination, separately. In fact, until the new orders of Lord Lyndhurst in 1828, the cross-examination could not be taken before the same examiner who took the direct examination; and by statute, the witnesses of each party must be examined before a different examiner. 2 *Daniell's Ch. Pr.* 921.

The English mode of taking testimony, in chancery, was first changed in this state by the act of November 22d, 1790, (*Pamph. L.* 681,) by which witnesses were required to be examined in open court, and their depositions to be reduced to writing by some person appointed by the court for that purpose; nothing is said in this act about the signing of the depositions. The act respecting the Court of Chancery, in the revision of 1799, by section 35, (*Pamph. L.* 432,) provided " that the mode of proof by oral testimony, and the examination of witnesses in open court, shall be the same in the Court of Chancery as in the Supreme Court of this state, at common law; and that such examination shall be reduced to writing by some person appointed by the court, *signed by the examinant,* filed with the clerk, and made use of in the cause." A supplement to this act, passed December 3d, 1801, (*Bloomfield's Comp.* 84,) directed that thereafter, examinations of witnesses in suits in chancery should be taken and reduced to writing by examiners of that court, who were authorized to administer the oaths to the witnesses, which, in England, could be administered only by masters; and each party was at liberty, in person or by counsel, to examine or cross-examine witnesses. These examinations were to be filed with the clerk. Nothing is provided as to signing the depositions by the witness. These provisions were substan-

tially re-enacted in the revisions of 1820, (*Rev. L.* 703, § 3,) and of 1846, (*Nix. Dig.* 110, § 41.) There is no statute or rule of this court expressly requiring the signature of the witness.

But the act of 1801, which repealed the act of 1799, and the practice of examining witnesses in open court, which had been in use for eleven years, in requiring the examination of witnesses to be taken and reduced to writing "by examiners of that court," intended by this reference to these disused officers of the court to revive the old practice of examination, except so far as changed by that act. It provided for oral examination and cross-examination by counsel present at the time, and for filing the depositions without the formality of publication; but it must be intended that it did not mean to dispense with signing by the witness, it was at least as necessary as when the witness was examined in open court, in which case it was required by the act then repealed. Besides, the general and I believe universal practice by all examiners since the act of 1801, has been to require the witness to sign his deposition, it having been first read to him. The latter is a safe and prudent practice. And the many gross and palpable errors in the other depositions in this case, show both that it has not been attended to, and the importance of its being done. For these reasons, and especially relying on the long established practice in this state as settling both the construction of the statute and the rule of this court, I am of opinion that depositions not signed by the witness are imperfect, and cannot be read.

The settled rule in the English courts requires that the party producing a witness should retain him before the examiner for cross-examination. The rule in chancery there, requires that he should be retained at least forty-eight hours for the cross-examination to begin. 2 *Daniell's Ch. Pr.* 921; 1 *Barb. Ch. Pr.* 285, 286.

If a witness who has signed his direct examination dies before he is cross-examined, his testimony is allowed to be read. *Arundel* v. *Arundel*, 1 *Rep. in Chan.* 90, decided in 1635, by Lord Kerper Coventry, recognized by Lord Redesdale in

*O'Callaghan* v. *Murphy*, 2 *Sch. & Lef.* 158, and by Sir Anthony Hart, in *Nolan* v. *Shannon*, 1 *Molloy* 157.

Lord Eldon held that if the witness appeared for cross-examination, and refused to answer, his direct examination should not be suppressed, because it was in the power of the party wishing to cross-examine to take measures to compel him to answer. *Courtenay* v. *Hoskins*, 2 *Russ.* 253. But where the witness secretes himself, it is held that his deposition should be suppressed, on the ground that such witness is not worthy of credit. Lord Hardwicke so held in 1756, in *Flowerday* v. *Collett*, 1 *Dick.* 288. The deposition in this case comes within the letter and reason of Lord Hardwicke's rule, and upon principles in which I entirely concur, must be suppressed. The authorities on this subject are collected in the opinion of Justice Story, in *Gass* v. *Stinson*, 3 *Sumner* 98.

The defendant has, in my opinion, entirely failed to sustain, by proof, her defence of adultery in the complainant, set up by way of recrimination. His admission, that when in New York and intoxicated, he had met a girl named Ella, and the fact that he called out her name in his sleep, or when partly intoxicated and half asleep, might excite suspicions, but fall far short of proof of adultery. And all the defendant's testimony with regard to his diseases without any regard to the denials on his part, do not show or even raise any strong suspicion that he has ever had any venereal disease since his marriage with her. This view of the evidence makes it unnecessary to consider the questions of condonation by the defendant, and whether the acts of adultery set up by way of recrimination are sufficiently specified in the answer.

The main question in the cause to be determined is one of fact. It is whether the charge of adultery on which the application for divorce is founded, is sufficiently proved. Upon a careful consideration of the evidence, I am of opinion that the adultery of the defendant, with George Moore, on the 31st of August, 1868, charged in the bill, is fully proved. The direct evidence of Abraham Flavell as to the position in which he found them, and their conduct at the time is

sufficient to establish the fact. The denial by the defendant under oath, and her explanation of her situation, and the facts which led to it, are plausible, and might lead me to hesitate as to her guilt, were it not that her conduct at the time, and during the whole week she continued in the house of her father-in-law, and her implied admission made to the mother and father and sister of her husband, are inconsistent with it. It is incredible that if the father of her husband found her in such equivocal situation as she admits, and she was in the act of resisting the attempts of Moore against her virtue, that she would have immediately escaped from the room in silence, as one caught in an act of shame, instead of loudly denouncing to her father-in-law, the man whom she knew he disliked, and whom he found attempting to force or seduce the wife of his son. If she found that her husband's relatives were wrongly suspecting her of crime, when she had been only sinned against, she would not for a week have submitted herself tamely, in tears of apparent penitence, to their reproaches, and to exclusion from the presence of her husband, who was in the room next to her, but would have been roused to assert her rights, and if she could not have had fair treatment there, would have gone to the house of her father, which was not far away, and appealed to him for redress and protection. When her father came to her, she made no attempt to vindicate herself before him, and did not impress him with her innocence and injury so as to make him willing to take her to his house. Her previous conduct in regard to Moore had been, before the 31st of August, such as to excite and justify suspicions in the father and mother of her husband. This conduct had caused the father to watch her movements with Moore, and to follow them to the room where he caught them in the position which he describes.

There must be a decree for divorce.